841 So.2d 623 (2003)
Jason R. LIGHT, Appellant,
v.
STATE of Florida, Appellee.
No. 2D01-974.
District Court of Appeal of Florida, Second District.
April 4, 2003.
James Marion Moorman, Public Defender, and Cynthia J. Dodge, Assistant Public Defender, Bartow, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Danilo Cruz-Carino, Assistant Attorney General, Tampa, for Appellee.
ALTENBERND, Chief Judge.
Jason R. Light appeals his conviction for second-degree murder. After carefully reviewing all of the evidence in the light most favorable to the State, we conclude that the State failed to present a prima facie case of second-degree murder. We reverse and remand with directions to the trial court to enter a judgment of conviction for the lesser-included offense of manslaughter and to resentence Mr. Light accordingly.
On July 24, 1999, Jason Light and some of his friends went to a Sarasota bar, "The Rum Shack," to listen to live performances by three bands playing heavy metal music. Although Mr. Light was only 18 years old, he and his friends had apparently been drinking prior to arriving at the bar. The bar was dark, smoky, crowded, and very loud. One of the other patrons happened to videotape the performance of a band called "Struggle," during which this incident occurred. Thus, the conditions inside the bar that caused witnesses to have limited and varying descriptions of the incident are well presented in this record.
During the concert, a mosh pit formed. For those fortunate enough to be unfamiliar with this practice, a "mosh pit" is an area adjacent to a concert stage where *624 people slam dance. "Slam dancing" is a form of dance in which participants, typically male, hurl themselves forcefully and repeatedly into one another. It is essentially a consensual contact sport with few clear-cut rules, and no designated referees.[1] When it occurs at bars, as it did in this case, many of the participants and onlookers may be under the influence of alcohol. Slam dancing is usually performed to heavy metal or punk rock music, which has a hard rhythm and often aggressive lyrics.
Mr. Light was slam dancing about 11:15 p.m. when the victim entered the mosh pit. Mr. Light did not know the victim, and there is no evidence that they had ever had any prior contact with one another. The victim, a man in his twenties, was intoxicated. A bartender had previously refused to serve the victim any more drinks. Witnesses described him as constantly stumbling in the mosh pit.
At some point, the victim fell back against Mr. Light. At least one witness testified that Mr. Light claimed the victim hit him in the genitals. The victim remained on the dance floor and began rolling around in the area of the mosh pit. Although versions of this incident varied and are not described clearly by the witnesses, the best evidence for the State suggests that Mr. Light immediately picked up the victim in what witnesses described as a wrestling move, upended him, and slammed him to the floor. The victim's head hit the solid floor, rendering him unconscious. This entire incident took only seconds and was not accompanied by any fighting words or other indications of an ongoing altercation between the two dancers.
Employees of the Rum Shack carried the unconscious victim outside and laid him on the ground. They placed ice on his head and shined flashlights in his eyes until he regained some level of consciousness. Apparently thinking the victim was merely intoxicated, they permitted his friends to take him home. The bar employees ordered Mr. Light to leave the bar.
The victim's friends assisted him in walking to a car and drove him home. Although the victim was initially able to walk with some assistance, once at home he became lethargic and began to lose consciousness again. His friends called 911 and the victim was rushed to the hospital. When the victim arrived at the hospital, his blood alcohol level was .295. Despite heroic measures at the hospital, the victim died as a result of a blunt force trauma to the left side of his head.
The State originally charged Mr. Light with manslaughter in this case and offered him a six-year youthful offender sentence. When Mr. Light rejected that offer, the State amended the information and sought a conviction for second-degree murder.
At trial, Mr. Light's counsel moved for a judgment of acquittal, arguing that the State had failed to prove that Mr. Light's actions demonstrated a depraved mind sufficient to sustain a conviction for second-degree murder. Although the trial court expressed doubt that Mr. Light's actions demonstrated the necessary ill will, hatred, spite, or evil intent, it denied the motion *625 for judgment of acquittal. The jury ultimately convicted Mr. Light of second-degree murder, and the trial court sentenced him to a guidelines sentence of 249.67 months' imprisonment followed by 8 years' probation.
On appeal, Mr. Light argues that his motion for judgment of acquittal should have been granted to the extent that the case should have been presented to the jury on only the lesser-included offense of manslaughter. In essence, he argues that the State was correct in its original assessment of its case against him. We agree.
In Pagan v. State, 830 So.2d 792, 803 (Fla.2002), the Florida Supreme Court recently summarized the standard of review on a motion for judgment of acquittal:
In reviewing a motion for judgment of acquittal, a de novo standard of review applies. Generally, an appellate court will not reverse a conviction which is supported by competent, substantial evidence. If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction.
Id. at 803 (citations omitted).
Although the factual lines that must be drawn between first-degree murder, second-degree murder, and manslaughter are often subtle and must permit a certain level of judgment by juries, the legal elements of these crimes are still distinct. Manslaughter is defined as "[t]he killing of a human being by the act, procurement, or culpable negligence of another." § 782.07(1), Fla. Stat. (1999). Culpable negligence is
a course of conduct showing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or such an entire want of care as to raise a presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard for the safety and welfare of the public, or such an indifference to the rights of others as is equivalent to an intentional violation of such rights.
Fla. Std. Jury Instr. (Crim.) 101. There is no question that Mr. Light's act of slamming the victim to the floor exhibited a "reckless disregard" for the life or safety of his victim.
The crime of second-degree murder, however, requires a more serious mens rea. The definition of second-degree murder is: "The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual." § 782.04(2), Fla. Stat. (1999). As explained in the standard jury instructions: "An act is `imminently dangerous to another and demonstrating a depraved mind' if it is an act or series of acts that: (1) a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and (2) is done from ill will, hatred, spite or an evil intent,[2] and (3) is of such a nature that the act itself indicates an indifference to human life." Fla. Std. Jury Instr. (Crim.) 98; see also Duckett v. State, 686 So.2d 662, 663 (Fla. 2d DCA 1996).
The context of these events admittedly makes it difficult to evaluate the first and third prongs necessary to a jury's determination that an act is imminently dangerous and evincing a depraved mind. For purposes *626 of this opinion, we assume that those prongs were proven by the State. However, the State failed to present competent, substantial evidence such that a rational trier of fact could find beyond a reasonable doubt that Mr. Light's acts were the product of ill will, hatred, spite, or an evil intent. See State v. Ellison, 561 So.2d 576 (Fla.1990); Duckett v. State, 686 So.2d 662 (Fla. 2d DCA 1996); see also Michelson v. State, 805 So.2d 983 (Fla. 4th DCA 2001). Although these cases are not completely analogous to the unique facts of this case, they demonstrate that extremely reckless behavior itself is insufficient from which to infer any malice. Moreover, other cases demonstrate that an impulsive overreaction to an attack or injury is itself insufficient to prove ill will, hatred, spite, or evil intent. See Williams v. State, 674 So.2d 177 (Fla. 2d DCA 1996); McDaniel v. State, 620 So.2d 1308 (Fla. 4th DCA 1993).
Although exceptions exist, the crime of second-degree murder is normally committed by a person who knows the victim and has had time to develop a level of enmity toward the victim. See, e.g., Conyers v. State, 569 So.2d 1360 (Fla. 1st DCA 1990) (victim is defendant's son); Dellinger v. State, 495 So.2d 197 (Fla. 5th DCA 1986) (victim is defendant's wife); Larsen v. State, 485 So.2d 1372 (Fla. 1st DCA 1986) (victim is defendant's wife). Hatred, spite, evil intent, or ill will usually require more than an instant to develop. See Hooker v. State, 497 So.2d 982 (Fla. 2d DCA 1986) (holding that second-degree murder established where defendant shot into occupied trailer killing stranger because of preexisting racial ill will). In this case, Mr. Light had no prior relationship with the victim prior to the victim entering the mosh pit. The conditions inside the bar made it virtually impossible for any witness to provide testimony that Mr. Light demonstrated any enmity at the time of the incident, and no such testimony was provided. The circumstantial evidence in this case regarding Mr. Light's intent or state of mind is equally supportive of a theory that Mr. Light was simply guilty of a serious, momentary misjudgment concerning the amount of force that was permissible on the dance floor or that he reacted impulsively and excessively to being hit in the genitals. Such conduct fits within the definition of culpable negligence, which allows a homicide conviction, but only as manslaughter. See § 782.07(1).
Accordingly, we reverse and remand with directions to enter a judgment of conviction for the lesser-included offense of manslaughter and to resentence Mr. Light accordingly. See § 924.34, Fla. Stat. (2002).
CASANUEVA and DAVIS, JJ., concur.
NOTES
[1] Indeed, the few published legal opinions that reference slam dancing or mosh pits all involve some traumatic injury either from the act of slam dancing itself or from a later altercation stemming from the dance. See, e.g., Orear v. Allstate Ins. Co., 619 So.2d 974 (Fla. 2d DCA 1993) (reversing summary judgment in favor of insurance company because genuine issue of material fact existed as to whether slam dancing injury was result of intentional act that would be excluded from coverage); see also Adams v. Metallica, Inc., 143 Ohio App.3d 482, 758 N.E.2d 286 (2001); Fever's, Inc. v. Va. Alcoholic Beverage Control Bd., 24 Va.App. 213, 481 S.E.2d 476 (1997).
[2] We note that this language mirrors the Florida Supreme Court's definition of malice. See Reed v. State, 837 So.2d 366 (Fla.2002).